USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>March 3, 2010</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                  :

JOSEPH PELL LOMBARDI d/b/a JOSEPH PELL  :
LOMBARDI & ASSOCIATES, ARCHITECTS,    :
                                                  :

                    Plaintiff,           :      04 Civ. 6752 (PAC)
                                                  :

       - against -               :      <u>MEMORANDUM</u>
                                                  :      <u>OPINION & ORDER</u>

WHITEHALL XII/HUBERT STREET, LLC,    :
BKSK ARCHITECTS, L.L.P, PAVARINI     :
MCGOVERN, L.L.C., JOHN DOE and ABC   :
COMPANY,                               :
                     Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL. A. CROTTY, United States District Judge:

       Plaintiff Joseph Pell Lombardi, doing business as Joseph Pell Lombardi &

Associates, Architects, brings this action against Defendants, WXII/Hubert Street, LLC,[1]

Whitehall Street Real Estate Limited Partnership XII, WH Advisors, L.L.C., XII

(collectively, "Whitehall"), BKSK Architects, L.L.P. ("BKSK") and Pavarini McGovern,

L.L.C. ("Pavarini") asserting two claims of copyright infringement under the Copyright

Act of 1976 ("Copyright Act"), 17 U.S.C. § 101 <u>et seq.</u>, as amended by the Architectural

Works Copyright Protection Act ("AWCPA"), Pub. L. No. 101-650, §§ 701-706, 104

Stat. 5098, 5133-34 (1990) (codified in scattered sections of 17 U.S.C.).  Plaintiff alleges

that he designed an original building to be constructed at 137 Hudson Street, New York,

New York 10014, also known as 3-9 Hudson Street, and that the Defendants copied his

plans, the "Lombardi Plans," in designing and then constructing a building, called "the

Hubert," at the same location.

---

[1] While Plaintiff's First Amended Complaint ("Amended Complaint") names "Whitehall XII/Hubert Street, LLC" as a defendant, according to the Defendants that party's proper name is "WXII/Hubert Street, LLC." (Mem. in Supp. Mot. Summ J. on Equitable Estoppel at 1 n.1.)

Plaintiff commenced this action on August 20, 2004.  On January 29, 2007, Plaintiff filed an Amended Complaint asserting two claims of copyright infringement. The first claim, asserted against all of the Defendants, is for copyright infringement of an architectural work.  Plaintiff claims that the plans for the Hubert, prepared by BKSK, and the Hubert itself, constructed by Whitehall, BKSK and Pavarini, infringe on his registered copyright in the Lombardi Plans.  The second claim, asserted solely against BKSK, is for copyright infringement of technical drawings.  According to the Amended Complaint, the plans prepared by BKSK for the Hubert infringe on Plaintiff's registered copyright in the technical drawings for the Lombardi Plans.  Plaintiff seeks an award of damages, equitable relief and attorneys' fees.  In their Answer to the Amended Complaint, Whitehall and Pavarini assert a counterclaim for a declaratory judgment that they have not infringed on Plaintiff's copyright.

Defendants now move for summary judgment.  In three separate motions they contend that (1) Plaintiff is equitably estopped from asserting his copyright infringement claims; (2) Plaintiff has failed to adduce sufficient evidence of copyright infringement; and (3) Plaintiff is not entitled to recover attorneys' fees. [2]  The defense of equitable estoppel has not been proved, and the Defendants have not shown that they are entitled to judgment as a matter of law on Plaintiff's copyright infringement claims.  Accordingly, and for the reasons that follow, Defendants' motions for summary judgment on equitable estoppel and non-infringement are denied.  Plaintiff concedes that he is not entitled to

---

[2] The three motions, along with supporting memoranda, were filed by Whitehall and Pavarini.  BKSK also filed a notice of motion for summary judgment on the same three grounds, but has not filed any supporting memoranda.  Counsel for BKSK informed the Court that BKSK joins the arguments made by Whitehall and Pavarini.

recover attorneys' fees and Defendants' motion for summary judgment on Plaintiff's prayer for attorneys' fees is accordingly granted.

**BACKGROUND**

**I. Facts**

Stanley Scott ("Scott") was the controlling owner of 137 Hudson Street Associates L.P., the company which owned 137 Hudson Street, the lot on which the Hubert was ultimately built (the "Hubert Site").  (Deposition of Stanley Scott ("Scott Dep.") at 8:4-12, 12:25-13:18.)  Through another company, 145 Hudson Street Associates, L.P., Scott also owned the adjoining building at 145 Hudson Street ("145 Hudson").  (Id. at 8:4-12.)  Plaintiff, who is an architect, was hired by Scott in 1995 or 1996 to prepare architectural plans (the "Lombardi Plans") for a building to be constructed at the Hubert Site.  (Id. at 9:23-12:21; Amended Complaint ("Am. Compl.") ¶¶ 16-17.)  In addition to preparing architectural plans, Plaintiff was to gain approval for the plans from New York City's Landmarks Preservation Commission ("LPC")[3] and Board of Standards & Appeals ("BSA").  (1/22/1996 Letter from Lombardi to Scott; 7/27/96 Letter from Lombardi to Scott; Scott Dep. at 9:23-12:21.)  Plaintiff and Scott did not, however, enter into a formal written contract, and they never discussed who would own the yet to be developed plans, their copyrights or any other rights relating to the

---

[3] The LPC "is the New York City agency responsible for identifying and designating the city's landmarks and the buildings in the city's historic districts."  About: Mission of the Landmarks Preservation Commission, http://www.nyc.gov/html/lpc/html/about/mission.shtml (last visited February 21, 2010).  The LPC is charged with, among other things, safeguarding the "city's historic, aesthetic, and cultural heritage."  Id.

plans.  (Deposition of Joseph Lombardi ("Lombardi Dep.") at 13:16-23, 18:11-19:3; Scott Dep. at 87:2-89:9.)[4]

Soon after being hired, Plaintiff began to work on the Lombardi Plans.  Plaintiff intended for the Lombardi Plans to share similarities with 145 Hudson.  (Lombardi Dep. at 131:3-6.)  The similarities included the tripartite design, industrial style windows and the use of limestone at the base and as trim throughout the building.  (Id. at 131:7-21.)  During a June 25, 1996 presentation to the LPC, Plaintiff explained that he sought to have his design "relate as much as possible in every characteristic to the [145 Hudson Street] building and be sympathetic to it, not fight it in any way."  (Tr. of 6/25/1996 LPC Hearing at 7.)  The LPC approved of the Lombardi Plans, and issued a certificate of appropriateness ("COA") on February 10, 1997.  (2/10/1997 COA for 3-9 Hubert Street.)  The COA, which was required for building at the Hubert Site to commence, states that the Lombardi Plans are "closely derived," in a number of ways, from 145 Hudson, and that the building to be constructed will establish "a strong visual relationship with the historic building [145 Hudson] and with other historic buildings within the Tribeca West Historic District."  (Id.)

The story, however, becomes more complicated in the summer of 1997, when copyright law interacts with New York City real estate development.  Prior to August, 1997, Plaintiff learned that Scott intended to sell the Hubert Site.  (8/18/1997 Letter from Lawrence Lipson to Lombardi; 12/15/1997 Letter from Scott to Lombardi.)  And on December 15, 1997, Scott wrote to Plaintiff:

---

[4] Plaintiff sent Scott a letter on July 29, 1996, setting forth the terms of his employment, but the letter was never signed by Scott and does not refer to the ownership interests of Scott or Plaintiff in the plans created by Plaintiff.  (7/29/1996 Letter from Lombardi to Scott; Lombardi Dep. at 10:9-11:2.)

> In reviewing the retainer agreement for 145 Hudson Street and 137
> Hudson Street there appears to be items that should be removed or
> clarified:
> . . . .
>> Proforma – no anticipated additional work?
>> N.B. Plans & applications?
>> LPC?
>> Board of Standards?
> As 137 Hudson Street will not be developed by us and will probably be
> sold in the near future we should be completed soon, if not please explain.

(12/15/1997 Letter from Scott to Lombardi.)  After learning that Scott intended to sell the

property, Plaintiff completed the Lombardi Plans and obtained approval for the plans

from the relevant regulatory bodies.  (Defs.' Rule 56.1 Statement in Supp. of Mot. Summ.

J. on Equitable Estoppel ¶ 18.)  Scott then paid Plaintiff approximately $135,000 for

preparing the Lombardi Plans.  (Id. ¶ 19; Report of Wayne Hoberlein at 7-8; Lombardi

Dep. at 26:20-24.)

      In late 1997, Scott entered negotiations with Tishray Realty, LLC ("Tishray") to

sell the Hubert Site along with the Lombardi Plans.  (Scott Dep. at 40:5-42:8.)  During

the negotiations, one of Scott's attorneys wrote Plaintiff a memorandum stating:

"Enclosed, regarding the referenced premises [137 Hudson Street], are copies of the plans

attached as an exhibit to the Sale-Purchase Agreement with Tishray Realty, LLC."

(11/12/1998 Memo from Amy Williams to Lombardi.)  The memo asks Plaintiff to

"review the enclosed plans and let Larry Lipson [Scott's attorney] or me know if they are

substantially similar to the approved plans that we are awaiting from the BSA."  (Id.)  As

requested, Plaintiff reviewed the plans, and Scott paid him for doing so.  (Defs.' Rule

56.1 Statement in Supp. Mot. Summ. J. on Equitable Estoppel ¶ 23.)  Scott, however, did

not sell the Hubert Site to Tishray.  (Scott Dep. at 59:4-13.)

Next, Plaintiff was part of a group that attempted to purchase the Hubert Site in late 1999. (Lombardi Dep. at 43:5-7; Defs.' Rule 56.1 Statement in Supp. Mot. Summ. J. on Equitable Estoppel ¶ 25.)  On October 19, 1999, Scott sent Plaintiff, and a member of the group attempting to purchase the Hubert Site, Michael Steinberg ("Steinberg"), a letter (the "Letter of Intent") setting forth the basic terms of his offer.  (10/19/1999 Letter of Intent; Lombardi Dep. at 45:3-5.)  Under the heading, "Instrument of Transfer," the Letter of Intent states:

> The closing documents would also transfer to the Purchaser all of Seller's right, title and interest in and to the plans and specifications, the variance, and approvals (including approvals by Landmarks and BSA), and any other tangible or intangible matters pertaining to the development of the project all of which would be fully paid for and free of liens.

(10/19/1999 Letter of Intent.)  Plaintiff reviewed the Letter of Intent upon receipt, (Lombardi Dep. at 45:10-12), and admits that the "plans" referenced in the letter are the plans he had developed.  (Id. at 46:20-47:3.)  Plaintiff also testified that he did not recall discussing the letter's reference to transferring the "plans" with Scott.  (Id. at 47:4-8.)  Ultimately, Plaintiff and Steinberg did not sign the Letter of Intent.  (Id. at 45:13-14.)  To the best of Plaintiff's recollection, his group chose not to purchase the Hubert Site because of ongoing litigation between Scott and Tishray and because of an appeal by a civic group of the BSA's approval of the Lombardi Plans.  (Id. at 43:7-44:9, 45:16-46:6.)

At some point prior to December, 1999, Whitehall and Scott entered negotiations for the purchase and sale of the Hubert Site.  On December 17, 1999, Scott, through 137 Hudson Street Associates L.P., entered into a contract (the "Sale-Purchase Agreements") with an entity known as 137 Hudson Street LLC for the sale of the Hubert Site. (12/17/1999 Sale-Purchase Agreement.)  It appears that 137 Hudson Street LLC was

controlled by Whitehall, and on September 19, 2000, 137 Hudson Street LLC assigned

the Sale-Purchase agreement to Whitehall.  (9/19/2000 Assignment & Assumption of

Sale-Purchase Agreement.)  Three days later, on September 22, 2000, Whitehall and

Scott closed on the Hubert Site.

During the negotiations leading up to the Sale-Purchase Agreement, counsel for

Whitehall requested that Scott obtain "an assignment duly executed by the architect of

the [Lombardi] Plans which assigns to Purchaser all of the architect's rights to the

Plans[.]"  (Draft Sale-Purchase Agreement ¶ 12.1 attached to 11/22/1999 Letter from

Scott Fuer to Lawrence Lipson.)  Scott's counsel, Lawrence Lipson ("Lipson"),

responded on November 24, 1999, stating:

> Your insert 12.1 was not made . . . (ii) your request that the architect
> assign its rights to the plans is not necessary since an appropriate
> representation has been made with respect to the Seller's rights to assign
> the plans and Mr. Lombardi has no reason to cooperate with the Seller or
> any obligation to do so . . . .

(11/24/1999 Letter from Lipson to Steven Estroff.)  During his deposition, Lipson

explained that the reason he wrote that Plaintiff had no reason to cooperate was because,

"Mr. Lombardi was interested in buying the property.  There would be no reason for him

to cooperate to sell the property to somebody else."  (Deposition of Lawrence Lipson

("Lipson Dep.") at 73:12-18.)

The Sale-Purchase Agreement provides that at closing Scott will provide an

"Assignment Agreement" assigning, among other things, "any plans in Seller's

possession prepared on Seller's behalf in respect to the Premises by The Office of Joseph

Pell Lombardi & Associates . . . [and] any other permits, plans and/or approvals with

respect to the Premises."  (Sale-Purchase Agreement at 19.)  Through the Sale-Purchase

Agreement, Scott represented that "no person or entity other than Seller has a right to the Plans and the plans referenced in the Permit, and Seller has the right to assign the Plans and such plans free and clear of the rights of any other person or entity (including, without limitation, the rights of the architect that prepared the same)." (Id. at 30.) Scott testified that he "believe[d]" that he had purchased the rights to the Lombardi Plans, (Scott Dep. at 70:21-71:2), but also that he never discussed the issue with Plaintiff. (Id. at 87:2-89:9; Lombardi Dep. at 13:16-23, 18:11-19:3.)

Plaintiff and his associates, including Gary Silver ("Silver"), assisted Scott in negotiating the sale of the Hubert Site to Whitehall. (Defs.' Rule 56.1 Statement in Supp. Mot. Summ. J. on Equitable Estoppel ¶ 38.) Scott wanted to ensure that the building constructed at the Hubert Site did not interfere with the light and sight lines of his building at 145 Hudson. (Id. ¶ 41; Lombardi Dep. at 99:15-100:9.) Accordingly, Scott insisted that Whitehall enter into an agreement limiting the "envelope," or features, of any building constructed at the Hubert Site. The Sale-Purchase Agreement provides:

> Notwithstanding anything to the contrary contained herein, any building improvements constructed on the Premises (collectively, the "Building") by Purchaser shall be constructed generally within the height, bulk and setback limitations set forth on the plans approved by The Board of Standards and Appeals of the City of New York (the "BSA") in connection with the Resolution (hereinafter defined), which plans are annexed as Exhibit "D" attached hereto, provided that Purchaser may: (i) increase the height of the Building to not in excess of One Hundred Ninety-Five (195) feet above curb level in order to install mechanical equipment on the top of the Building, and/or (ii) construct the Building to cover the entire lot that comprises the Premises (i.e., to cover the "footprint" of the Premises) but only up to a horizontal plane that is no higher that Thirty-Three (33) feet above curb level (provided that any such construction shall be performed in a manner that does not result in 145 Hudson being required pursuant to applicable laws or requirements to close-up or otherwise block any windows located on the 145 Hudson Street Building (hereinafter defined)). Purchaser shall not seek changes in the zoning applicable to the Premises or any variances with respect to the

> Premises.  The provisions of this Section 5(A) shall survive the Closing
> and shall be incorporated into an agreement (the "Improvements
> Agreement") to be executed by 145 Hudson and Purchaser at the Closing
> and thereafter recorded (which Improvements Agreement shall include a
> provision requiring the parties thereto to provide estoppel certificates with
> respect to the forgoing from time to time).

(Sale-Purchase Agreement at 5.)

Plaintiff and Silver assisted Scott in negotiating this restriction on the bulk and

features of the Hubert Site structure.  (Defs.' Rule 56.1 Statement in Supp. Mot. Summ. J.

on Equitable Estoppel ¶ 39.)  During the negotiations, Plaintiff asked Jerome Karr

("Karr"), a Whitehall representative, whether Whitehall would hire him as "the architect

for the project."  (Deposition of Jerome Karr ("Karr Dep.") at 41:22-25.)  Karr answered

in the negative, telling Plaintiff that "we already ha[ve] an architect."  (Id. at 42:10-13.)

At closing, Scott entered into an "Improvements Agreement," and then an

"Amended and Restated Improvements Agreement" (together, "Improvements

Agreement") with Whitehall through his company 145 Hudson Street Associates L.P.

(9/22/2000 Improvements Agreement; 9/22/2000 Amended and Restated Improvements

Agreement.)  The features limited by the Improvements Agreement relate to, among

other things, the "massing exterior shape, proportions solid-void relationships," and the

"shape and dimensions of the footprint of the . . . [Whitehall] building as it sits on the

[Hubert] site.  (Id.; Defs.' Rule 56.1 Statement in Supp. Mot. Summ. J. on Equitable

Estoppel ¶ 39.)  The Improvements Agreement also requires that any building

constructed at the Hubert Site be "within the height, bulk and setback limitations of the

building depicted on the plans annexed as exhibit 'C-1' and 'C-2' attached hereto and

made part hereof."  (9/22/2000 Improvements Agreement; 9/22/2000 Amended and

Restated Improvements Agreement; Defs.' Rule 56.1 Statement in Supp. Mot. Summ. J. on Non-Infringement ¶ 11.)

On September 22, 2000, Scott and Whitehall closed on the Hubert Site for $12 million.  The closing documents included a copy of the Lombardi Plans.  (Sale of the Land Located at 137 Hudson Street, New York, New York dated 9/22/2000.)  Scott also assigned to Whitehall "any plans in Grantor's possession prepared by the Office of Joseph Pell Lombardi & Associates . . . and any other permits, plans and/or approvals in Grantor's possession related to the property."  (Id. at SS 00528.)  Three days after closing, on September 25, 2000, Plaintiff submitted a $3,035.00 bill to Scott for "[c]onsultation and prep for closing on project transfer."  (9/25/2000 Lombardi Invoice.)

Whitehall retained BKSK, an architectural firm, to design a new building for the Hubert Site.  (6/1/2001 Architects Service Agreement between Whitehall and BKSK.) Whitehall instructed BKSK to "create a fresh design."  (Defs.' Rule 56.1 Statement in Supp. Mot. Summ. J. on Non-Infringement ¶ 16.)  Notwithstanding Whitehall's request for a "fresh" design, Karr testified that Whitehall had copies of the Lombardi Plans at the time BKSK was hired and that those plans were given to BKSK.  (Karr Dep. at 124:12-23.)  BKSK partner, Harry Kendall ("Kendall"), admitted that BKSK reviewed the Lombardi Plans prior to contracting with Whitehall.  (Deposition of Harry Kendall ("Kendall Dep.") at 28:2-18.)  James Koster ("Koster"), a BKSK architect who worked on the design of the Hubert, said that he also had a copy of the Lombardi Plans. (Deposition of James Koster ("Koster Dep.") at 61:3-62.15.)

BSKS began working on the design of, and plans for, the building to be constructed by Whitehall at the Hubert Site.  After completing the plans, BKSK

submitted them to the LPC and the BSA for review.  (Defs.' Rule 56.1 Statement in

Supp. Mot. Summ. J. on Non-Infringement ¶ 17.)  The LPC considered BKSK's

proposed design at public hearings on February 27 and March 20, 2001.  (Tr. of

2/27/2001 LPC Hearing; Tr. of 3/20/2001 LPC Hearing.)  The LPC rejected BKSK's

"fresh design," and made it clear that the structure at the Hubert Site should relate to 145

Hudson.  (Id.)  A member of the LPC explained that "as I've said to you before, this is a

difficult project because when we first looked at it we looked at it as I don't know if twin

was the right building, but we looked at it as part of a composite project with the other

building [145 Hudson]."  (Tr. of 3/20/2001 LPC Hearing at 7:20-8:2.)  The LPC

compared the plans submitted by BKSK to the Lombardi Plans and one member of the

LPC stated that "when I saw this building next to the previously approved building I still

felt my sentiments were with the previously approved design, that it seemed to work

better . . . [with] its neighbor, 145 Hudson Street."  (Id. at 9:16-18; Comparison Drawing

Prepared by BKSK of Exterior of 145 Hudson, the Lombardi Plans and the BKSK Plans

Rejected by the LPC, Declaration of John H. Nash in Supp. of Defs.' Mot. Summ. J. on

Non-Infringement, Ex. H-1.)

 Kendall, Koster, and BKSK architect Stephen Byrnes ("Byrnes"), attended the

LPC hearing on March 20, 2001.  Koster's notes of the hearing state, among other things,

his understanding of the various committee members' opinion of the design submitted by

BKSK.  (Koster Notes of 3/20/2001 LPC Hearing.)  Next to the names of the various

commissioners, Koster's notes state: (1) "no resemblance to prev. scheme," (2) "take

more clues from original approval," and (3) "previous scheme which treated it as a 'rear

site' – better."  (Id.)  However, Koster's notes also state that "old design appropriate

because it was a twin," and "don't go back to previous design.  [B]ut liked previous massing @ base . . . ."  (Id.)  Byrnes' notes read "preferred previous bldg!" and look "back at 145 Hudson." (Byrnes Notes of 3/20/2001 LPC Hearing.)  In addition to his notes of the LPC hearing, Koster took notes at a meeting held six days after the LPC rejected BKSK's proposed design.  Those notes state, "Lombardi scheme vs. revising our scheme."  (Koster's Notes of 3/26/2001 Meeting.)

After its plans were rejected by the LPC, BKSK returned to the drawing board and created new plans (the "Hubert Plans") for the Hubert Site. (Koster Dep. at 83:20-23.)  Koster explained:

> The process began with making a number of very careful sketch studies of 145 Hudson and its details, the kind of chevrons and brick work and understanding that flat arches near the top and the crenulations along the parapet.  We took extensive photographs both overall and zoom shots to pick out the details around the top of the building to understand how the brick was laid and the kind of rhythm that the façade has and I remember especially looking at the entry way, that it has a very nice sort of stepped massive, but stepped kind of entry way that 145 has which we used on the entry way for 137 [the Hubert] and, you know, we derived a substantial amount of our detail and ultimate aesthetic for the project from doing what Landmarks had asked us to do, looking much more closely at 145 . . . .

(Koster Dep. at 84:6-24.)  Koster testified further that BKSK did not refer to the Lombardi Plans in creating the Hubert Plans.  (Id.  at 85:2-6.)  Consistent with Koster's explanation of how BKSK created the Hubert Plans, the report of the Defendants' expert witness, George Ranalli ("Ranalli"), states that, "[o]ne of the best and most common ways to ensure a building fits into . . . [the] character [of a neighborhood] is to take features from existing buildings in a landmark designed area."  (Expert Report of George Ranalli at ¶ 11.)

On May 1, 2001, BKSK submitted the Hubert Plans to the LPC for review, and presented them in a side-by-side comparison with the Lombardi Plans.  (Comparison Drawings Prepared by BKSK of the Exterior Elevations of 145 Hudson, the Lombardi Plans, and the Hubert Plans, Nash Decl. in Supp. of Mot. Summ. J. on Non-Infringement, Ex. H-2.)  At the LPC's request, boards with the Hubert Plans were displayed on easels. (Tr. of 5/1/2001 LPC Hearing at 42:18-21.)  By coincidence, Plaintiff was also at the LPC hearing and made a presentation on a different matter in the same room where the Hubert Plans were displayed.  (Id. at 69:17-73:25.)

The LPC did not act on May 1, 2001, and at another session on May 8, 2001, Kendall stated that "[i]n response to the commissions extensive comments two meetings ago, we came back with a, having reconceived this building frankly, much more along the same lines that Mr. Lombardi originally had, at his time it was [a] literal annex to the 145 Hudson[,] now we have used a similar material for the two story base[,] used an essentially identical material for the brick fladding of the new building so that its visual annex to 145 Hudson [sic]."  (Tr. of 5/8/2001 LPC Hearing at 1:23-2:2.)  On June 1, 2001, the LPC approved the Hubert Plans and issued a COA to Whitehall.  (6/1/2001 Amended COA for 3-9 Hubert Street.)  The COA refers to the previously approved Lombardi Plans and notes the similarities between the Hubert Plans and 145 Hudson. (Id.)

Having obtained approval for the Hubert Plans, in January, 2003, Whitehall hired Pavarini, a construction company, to build the Hubert.  (Amended Complaint ¶ 33; Defs.' Rule 56.1 Statement in Supp. of Mot. Summ. J. on Equitable Estoppel ¶ 54.) Construction commenced, and the Hubert was completed in the summer of 2004.  (Defs.'

Rule 56.1 Statement in Supp. of Mot. Summ. J. on Equitable Estoppel ¶ 55.)  Plaintiff has

an office in Tribeca and during construction he would walk past the Hubert Site two to

three times a month.  (Lombardi Dep. at 85:6-87:22.)

On December 30, 2003, Plaintiff applied to register a copyright in the exterior

elevations, i.e. façades, set forth the Lombardi Plans as an architectural work.

(Certificate of Registration No. VAu 605-597.)  On April 2, 2004, the United States

Copyright Office ("Copyright Office") issued Plaintiff Certificate of Registration number

VAu 608-597.  (Id.)  On August 5, 2004, Plaintiff submitted another application for the

façade of the Lombardi Plans.  (Certificate of Registration VAu  624-405.)  Plaintiff

submitted the August 5th application in order to provide the Copyright Office with

documents "not previously deposited with the application for VAu 608-597 reflecting

more clearly architectural features of this work."  (Id.)  Attached to the application is a

continuation sheet where Plaintiff enumerated "[t]he original design contributions made

by JOSHEPH PELL LOMBARDI to 3-9 Hubert Street/137 Hudson Street . . . ."  (Id.)

On August 6, 2004, the Copyright Office issued Plaintiff Certificate of Registration

number VAu 624-405.  (Id.)

In the sections of his applications for the two Certificates of Registration titled,

"Derivative Work or Compilation," Plaintiff wrote that his design is "based upon" and

"references elements of" a "previously constructed building at 145 Hudson Street in New

York City."  (Certificate of Registration No. VAu 605-597; Certificate of Registration

VAu  624-405.)  Under the heading, "Materials Added to This Work," in his application

for Certificate of Registration number VAu 605-597, Plaintiff wrote, "[a]rchitectural

plans relating to claimant's adaptation of the design of the original building."  (Certificate

of Registration No. VAu 605-597.)  Also on August 5, 2004, Plaintiff applied to register

a copyright in the technical drawings for the Lombardi Plans.  (Certificate of Registration

No. VAu 624-206.)  On August 6, 2004, the Copyright Office issued Plaintiff Certificate

of Registration number VAu 624-206.  (Id.)  Plaintiff admits the copyrights evidenced by

the three Certificates of Registration extend only to the "East, West, North and South

exterior elevations (façades)" of the Lombardi Plans.  (Joseph Pell Lombardi &

Associates, Architects' Responses to Defendants' First Set of Requests for Admissions;

Defs.' Rule 56.1 Statement in Supp. of Mot. Summ. J. on Non-Infringement ¶ 72.)

## DISCUSSION

### II. Summary Judgment Standard

Summary judgment is appropriate where the record demonstrates that "there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of

the suit under governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  The moving party bears the initial burden of producing evidence on each

material element of its claim or defense demonstrating that it is entitled to relief.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The evidence on each material

element must be sufficient to entitle the movant to relief as a matter of law.  Vt. Teddy

Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

Once the moving party has made an initial showing that no genuine issue of

material fact remains, the nonmoving party may not refute this showing solely by means

of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp.

v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotations

omitted), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts.  Fed. R. Civ. P. 56(e).  The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

## III. Equitable Estoppel

The affirmative defense of equitable estoppel, "'is a drastic remedy and must be utilized sparingly.'"  Fitzpatrick v. Sony-BMG Music Entm't, Inc., No. 07 Civ. 2933(SAS), 2008 WL 84541, at *3 (S.D.N.Y. Jan. 8, 2008) (quoting Mattis v. Zheng, No. 05 Civ. 2924, 2006 WL 3155843, at *4 (S.D.N.Y. Oct. 27, 2006)).  A copyright holder is estopped from asserting an infringement claim where:

> (1) plaintiff had knowledge of the defendant's [infringing] conduct; (2) plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions [suggesting authorization], or (b) acted or failed to act in a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment.

SimplexGrinnell LP v. Integrated Sys. & Power, Inc., 642 F. Supp. 2d 167, 194 (S.D.N.Y. 2009) (quoting DeCarlo v. Archie Comic Publ'ns, Inc., 127 F. Supp. 2d 497, 509 (S.D.N.Y. 2001); accord 4 Nimmer on Copyright § 13.07 (2009) ("Nimmer").

"Whether equitable estoppel applies in a given case is ultimately a question of fact."  Kosakow v. New Rochelle Radiology Assocs, 274 F.3d 706, 725 (2d Cir. 2001). Where the facts are not in legitimate dispute, however, estoppel may be found as a matter of law.  See id. at 727; Price v. Fox Entm't Group, Inc., No. 05 Civ. 5259(SAS), 2007 WL 241387, at *4 (S.D.N.Y. Jan. 26, 2007); DeCarlo, 127 F. Supp. 2d at 511.

Defendants argue that Plaintiff is estopped from asserting his copyright infringement claims because his conduct led Scott, and thereafter the Defendants, to reasonably believe that Scott owned the Lombardi Plans when they were purportedly sold to Whitehall in 2000, and because Plaintiff failed to assert a copyright claim despite observing the Hubert Plans at the LPC hearing on May 1, 2001 and thereafter observing construction of the Hubert.  In response, Plaintiff asserts that he was unaware of the Defendants' infringement of his copyrights until late 2004, and that upon learning of the infringement, he commenced this action.

To prevail, Defendants must demonstrate that Plaintiff knew of the alleged infringing conduct at the time Plaintiff acted in a manner justifying the Defendants' belief that he would not pursue an infringement claim.  See Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc., No. 91 Civ. 4092(PKL), 1998 WL 734355, at *13 (S.D.N.Y. Oct. 15, 1998) ("'In order to prevail on the defense of equitable estoppel the defendant must have been misled into reasonably and justifiably believing that the plaintiff would not pursue his claims against the defendant.'") (quoting Merchant v. Lymon, 828 F. Supp. 1048, 1064 (S.D.N.Y. 1993)).  Defendants fail to make the requisite showing.

Defendants do not argue that Plaintiff does not hold a valid copyright in the Lombardi Plans, or that Scott in fact transferred the rights to the Lombardi Plans when he sold the Hubert Site to Whitehall in September, 2000.[5]  Instead, Defendants argue that Plaintiff did not object to Scott's acting as though he owned the Lombardi Plans, and so Plaintiff must have known that Scott would attempt to sell them to Whitehall.  Based on these contentions, Defendants argue that Plaintiff "indisputably knew that [defendant]

_____

[5] Whitehall and Paravini's counterclaim seeks a declaration that Whitehall owns the Lombardi Plans, but the Defendants do not raise the issue of ownership in their motions for summary judgment.

conducted itself as if it owned the rights that [plaintiff] now claims belong to him."
(Reply to Resp. to Mot. Summ. J. on Equitable Estoppel at 6) (quoting DeCarlo, 127 F.
Supp. 2d at 509).

Defendants point to Plaintiff's relationship with Scott; Plaintiff's completion of
the Lombardi Plans so that Scott could sell a buildable lot; Plaintiff's involvement with
the failed Tisharay deal; Plaintiff's attempt to purchase the Hubert Site; and Plaintiff's
role in preparing the Improvements Agreement.  Each of these assertions involve
contested issues of fact, however, and cannot support a finding of estoppel at the
summary judgment stage.

It is not at all clear, as Defendants contend, that Plaintiff "knew" that Scott
believed he owned the Lombardi Plans; both Scott and Plaintiff testified that they never
discussed who owned the rights to the Lombardi Plans.  (Scott Dep. at 87:2-89:9;
Lombardi Dep. at 13:16-23.)  And Plaintiff testified that it was his understanding that
Scott did not own the rights to the Lombardi Plans.  (Lombardi Dep. at 25:5-7; 27:8-10.)
Even if Scott asked Plaintiff to complete the Lombardi Plans so that the Hubert Site could
be sold, this does not show that Plaintiff knew that Scott believed he owned the plans.
Simply providing a copy of the Lombardi Plans would not transfer Plaintiff's copyrights
because "physical possession of a copyrighted work does not result in a grant of any of
the rights protected by copyright law."  SimplexGrinnel, 642 F. Supp. 2d at 194 (citing
17 U.S.C. § 202); see also Lantern Press Inc. v. Am. Publishers Co., 419 F. Supp. 1267,
1271 (E.D.N.Y. 1976).

In any event, whatever may be said about Plaintiff's knowledge about Scott's
position on who owned the Lombardi Plans, Defendants have not shown that Plaintiff

knew that Whitehall "conducted itself as if it owed the rights . . . [Plaintiff] now claims belong to him."  DeCarlo, 127 F. Supp. 2d at 509.  After purchasing the Hubert Site in 2000, rather than acting as if it owned the Lombardi Plans, Whitehall directed BKSK to create a "fresh design," that is, a design unlike the Lombardi Plans. As directed, BKSK prepared plans which were indeed unlike the Lombardi Plans, but those plans were rejected by the LPC.  Defendants have not adduced any evidence that Plaintiff was on notice that Whitehall itself believed that it was the owner of the Lombardi Plans and could use the plans as it pleased.

Defendants' assertions that Plaintiff knew of Whitehall's infringing conduct because he was present at the May 1, 2001 LPC hearing, and because he walked past the Hubert on numerous occasions during construction, have not been proven as fact and are too ephemeral to support summary judgment.  Defendants have not shown that Plaintiff was present at the LPC hearing when the Hubert Plans were on display, (Tr. of 5/1/2001 LPC Hearing at 42:18-21, 69:17), and Plaintiff testified that he could not see the façade of the Hubert until late 2003 because until then it was covered by scaffolding with netting.  (Lombardi Dep. at 87:3-15.)

Factual questions are also present regarding Plaintiff's intent and Whitehall's knowledge and reliance.  As to the intent element of estoppel, while "[s]ilence in the face of an explicit contrary assumption by an innocent party may constitute concealment of facts or a false misrepresentation for estoppel purposes," Price, 2007 WL 241387, at *4, Defendants' argument is founded on the faulty premise that Plaintiff knew that Scott intended to sell the Lombardi Plans when he sold the Hubert Site.  Again, the extent of Plaintiff's knowledge of Scott's understanding of his ownership interest in the Lombardi

Plans has not been proven as a matter of fact.  Plaintiff testified that he believed he owned the rights to the Lombardi Plans; Scott testified that he believed he owned the rights; and the two never discussed the issue.  Defendants have failed to establish that Plaintiff remained silent despite knowing that Scott believed he owned the Lombardi Plans.

As to Whitehall's knowledge and reliance, Defendants have not shown that Whitehall was "ignorant of the true facts."  SimplexGrinnell, 642 F. Supp. 2d at 194.  On the contrary, Whitehall clearly contemplated the possibility that Scott did not own the Lombardi Plans when it requested that Scott obtain "an assignment duly executed by the architect of the [Lombardi] Plans which assigns to Purchaser all of the architect's rights to the Plans[.]"  (Draft Sale-Purchase Agreement ¶ 12.1 attached to 11/22/1999 Letter from Scott Fuer to Lawrence Lipson.)  When Scott refused, Whitehall "should have taken positive steps" to determine the true owner of the rights to the Lombardi Plans.  Peer Int'l Corp. v. Luna Records, Inc., 887 F. Supp. 560, 567 (S.D.N.Y. 1995).  Instead of pressing the issue with Scott or Plaintiff, Whitehall chose to accept Scott's representation that he owned the plans.  This may or may not have been prudent, but Whitehall's failure to determine the true owner of the Lombardi Plans can not estop Plaintiff from asserting his copyright claims.

Defendants have failed to demonstrate that there are no genuine issues of material fact with respect to their affirmative defense of equitable estoppel.  Accordingly, the motion for summary judgment on equitable estoppel is denied.

**IV. Copyright Infringement**

The Copyright Act grants copyright holders "a bundle of exclusive rights, including the rights to 'reproduce the copyrighted work in copies' and 'to prepare derivative works based upon the copyrighted work.'" Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 137 (2d. Cir. 1998) (quoting 17 U.S.C. § 106). "'Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying.'" Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 132 (2d Cir. 2003) (quoting Castle Rock, 105 F.3d at 137-38). To prove unauthorized copying, the plaintiff must show that: "(1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's work." Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 122-23 (2d Cir. 1994).

Proof of actual copying may be made by either direct or indirect evidence. Castle Rock, 150 F.3d at 137. "Because direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially by demonstrating that the person who composed the defendant's work had access to the copyrighted material, and that there are similarities between the two works that are probative of copying[.]" Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003) (internal citations and quotation marks omitted). While some older cases refer to "substantial similarity" as a component of the actual copying inquiry, the Second Circuit has made clear that "'probative,' rather than 'substantial' similarity is the correct term in referring to the plaintiff's initial burden of proving actual copying by indirect evidence." Castle Rock, 150 F.3d at 136. "In the

context of deciding whether the defendant copied at all (as distinguished from whether it *illegally* copied), 'similarity' relates to the entire work, not just the protectible elements." Fisher-Price, 25 F.3d at 123.

If actual copying is established, "one claiming infringement is required to show substantial similarity between the two works relating to the protectible material." Repp v. Webber, 132 F.3d 882, 889 (2d Cir. 1997). That is, a plaintiff "must establish . . . that 'the copying amounts to an improper or unlawful appropriation,' i.e., (i) that it was protected expression in the earlier work that was copied and (ii) that the amount that was copied is 'more than de minimis.'" Tufenkian Imp./Exp., 338 F.3d at 131 (quoting Castle Rock, 150 F.3d at 137-38). Since "[t]he *sine qua non* of copyright is originality," Feist Publ'ns, Inc. v. Rural Tel. Servs. Co., Inc., 499 U.S. 304, 345 (1991), if a work, or an element thereof, is not original, "it is unprotectible." Boisson v. Banian, Ltd., 273 F.3d 262, 268 (2d Cir. 2001). "Some material is unprotectible because it is in the public domain, which means that it 'is free for the taking and cannot be appropriated by a single author even though it is included in a copyrighted work.'" Id. at 268 (quoting Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 710 (2d Cir. 1992)).

It is a fundamental principle that "all creative works draw [to some extent] on the common well-spring that is the public domain." Tufenkian Imp./Exp., 338 F.3d at 132. But, while one or more component elements of a work may be unoriginal and thus unprotectible,

> [c]opyright law may protect a combination of elements that are unoriginal in themselves. With respect to compilations of facts, for example, protection extends to choices of "selection and arrangement, so long as they are made independently by the compiler and entail a minimum degree of creativity." Feist Publications, 499 U.S. at 348, 111 S. Ct. 1282. The same principles apply to "derivative work[s]," which are "based upon one

> or more preexisting works." 17 U.S.C. § 101. . . . In either case, however,
> the copyright "extends only to the material contributed by the author of
> such work, as distinguished from the preexisting material employed in the
> work, and does not imply any exclusive right in the preexisting material."
> 17 U.S.C. § 103(b); Feist Publications, 499 U.S. at 348, 111 S. Ct. 1282
> ("[C]opyright protection [in a factual compilation] extend[s] only to those
> components of a work that are original to the author.").

Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 13 (2d Cir. 2001).  As explained in

Nimmer, "a selection or arrangement of underlying materials that are themselves

unoriginal, if originally combined, may support copyright protection. . . . Liability

follows if defendant substantially reproduced plaintiff's selection and arrangement, and is

avoided if defendant devised its own selection and arrangement . . . ."  1 Nimmer §

3.04(B)(2)(b); see Shine v. Childs, 382 F. Supp. 2d 602, 610 (S.D.N.Y. 2005).

The AWCPA "extended copyright protection to architectural works that are not

otherwise works of art."  Richard J. Zitz, Inc. v. Dos Santos Pereira, 232 F.3d 290, 292

(2d Cir. 2000); see 17 U.S.C. § 102(a)(8).  An "'architectural work' is the design of a

building as embodied in any tangible medium of expression, including a building,

architectural plans, or drawings.  The work includes the overall form as well as the

arrangement and composition of spaces and elements in the design, but does not include

individual standard features."  17 U.S.C. § 101.  In general, "architectural works are

subject to the same standards that apply to other copyrightable works."  1 Nimmer § 2.20.

And liability under the AWCPA "is not limited to actors who draw the blueprints of a

structure . . . ."  Axelrod & Cherveny Architects, P.C. v. Winmar Homes, No. 2:05-cv-

711-ENV-ETB, 2007 WL 708798, at * 6 (E.D.N.Y. 2007).  Instead, "direct liability

extends to builders as well."  Axelrod & Cherveny, Architects, P.C. v. T. & S. Builders

Inc., No. 05 Civ. 5573(DRH)(MLO), 2008 WL 3211272, at * 6 (E.D.N.Y. 2008).

Courts are generally "wary of granting summary judgment in copyright infringement cases because of their highly fact specific nature."  Yurman Studio, Inc. v. Castaneda, 591 F. Supp. 2d 471, 496 (S.D.N.Y. 2008); see also Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980).  Indeed, "a grant of summary judgment on a claim of copyright infringement is exceedingly rare."  Winmar Homes, 2007 WL 708798, at * 8; see also T. & S. Builders, 2008 WL 3211272, at *7 (same).

## A. Actual Copying

Defendants do not argue that Plaintiff's copyrights in the Lombardi Plans are invalid.  And it is undisputed that Defendants had access to the Lombardi Plans when the Hubert Plans were prepared.  Therefore, all Plaintiff must show in order to satisfy the actual copying requirement is that there are probative similarities between the Lombardi Plans and Hubert and its plans.  Defendants argue that Plaintiff cannot establish probative similarity because all of the elements of the Hubert he alleges were copied from the Lombardi Plans are not original elements but are instead elements of 145 Hudson.  Thus, according to the Defendants, Plaintiff cannot show that Defendants could only have created the Hubert Plans by copying the Lombardi Plans.  Defendants' argument fails because Plaintiff has adduced evidence that the Lombardi Plans are not simply copies of 145 Hudson and because Plaintiff need not show that the Hubert Plans could only have been created by reference to the Lombardi Plans.

While it is undisputed that the elements of 145 Hudson are in the public domain, and are therefore unprotectible, Plaintiff testified that he did not simply copy the façade of 145 Hudson in preparing the Lombardi Plans.  Indeed, Plaintiff testified that his design differed from that of 145 Hudson with regard to almost every element he contends

Defendants copied in preparing the Hubert Plans.  (Lombardi Dep. at 137:7-13, 137:21-23, 142:12-14, 145:23-146:4.)  Since Defendants have failed to show that the Lombardi Plans are simply a copy of 145 Hudson, questions of fact remain regarding whether the similarities between the Lombardi Plans and Hubert and its plans are probative of copying; and more specifically, whether the similarities between the Lombardi Plans and the Hubert Plans are attributable to the Defendants copying the Lombardi Plans or 145 Hudson.[6]

Defendants' argument that they are entitled to summary judgment because Plaintiff cannot show that "Defendants could have created their Hubert design only by copying the Lombardi Plans," (Mem. in Supp. Mot. Summ. J. on Non-Infringement at 8), misstates Plaintiff's burden.  A prima facie case of actual copying is established by showing access and probative similarity.  Jorgensen, 351 F.3d at 51.  "Independent creation," on the other hand, "is an affirmative defense, evidence of which may be introduced to rebut a prima facie case of infringement."  Webber, 132 F.3d at 889.  Plaintiff's burden is not to disprove the possibility of independent creation, but instead to show similarities between the Lombardi Plans and the Hubert and its plans which are probative of copying.  There is conflicting evidence on whether the similarities between the Hubert and the Lombardi Plans are due to the Defendants copying 145 Hudson or the Lombardi Plans and so "there is at least an issue of material fact remaining for trial as to

_____

[6] Further support for Plaintiff's probative similarity argument is found in the notes taken by Koster and Byrnes at the March 20, 2001 LPC hearing; Koster's notes of the March 26, 2001 meeting; and Kendall's statement to the LPC at the hearing on May 8, 2001.  At the very least, this evidence shows that BKSK was aware of the LPC's predisposition towards the Lombardi Plans.  And Kendall's statement to the LPC that the Hubert Plans are "much more along the same lines that Mr. Lombardi originally had," (Tr. of 5/8/2001 LPC Hearing at 1:23-2:2), shows that the BKSK itself perceived similarities between the Hubert Plans and the Lombardi Plans.

the probative similarity between [the Hubert and the Lombardi Plans.]"  <u>Shine</u>, 382 F.
Supp. 2d at 612.

Defendants' expert, Ranalli, has submitted a report stating that Defendants did not
copy the Lombardi Plans and that any similarities between the Hubert and the Lombardi
Plans are due to the fact that both BKSK and Plaintiff "took inspiration and features"
from 145 Hudson.  (Expert Report of George J. Ranalli ¶¶ 3-4.)  Defendants claim that
since Plaintiff has not retained an expert, Ranalli's opinion is dispositive, and summary
judgment must be granted in their favor.   Defendants' reasoning is, however, flawed.

To be sure, in determining whether there are probative similarities between two
works, "analysis ('dissection') is relevant, and the testimony of experts may be received
to aid the tirer of the facts."  <u>Arnstein v. Porter</u>, 154 F.2d 464, 468 (2d Cir. 1946) (Frank,
J.); <u>see</u> <u>also</u> <u>Altai</u>, 982 F.2d at 713 ("expert testimony may be used to assist the fact finder
in ascertaining whether the defendant had copied any part of the plaintiff's work.");
<u>Laureyssens v. Idea Group, Inc.</u>, 964 F.2d 131, 140 (2d Cir. 1992) (noting that in
considering actual copying "dissection and expert testimony . . . are proper . . . ."); <u>Boone
v. Jackson</u>, No. 03 Civ. 8661(GBD), 2005 WL 1560511, at *4 (S.D.N.Y. July 1, 2005)
("Proof of actual copying may also include weighing expert testimony.").  While expert
testimony is relevant to the probative similarity inquiry, expert testimony is not
mandatory to show probative similarity.  Besides, Plaintiff has submitted other evidence
which tends to show probative similarity; namely, his testimony, the notes and statements
of Kendall, Koster and Byrnes, and the Hubert and Lombardi Plans themselves. At
present, there is no reason why Plaintiff cannot testify to the similarities between the

Lombardi Plans and the Hubert.[7]   Indeed, he is the best person to explain why his plans are not the same as 145 Hudson.  Plaintiff's testimony will be subject to an interested witness charge and perhaps other limiting and cautionary charges, but that does not mean he is incompetent to testify on the issue of probative similarity.  While a jury may find Ranalli to be more credible, that is a risk of litigation, not a reason to grant summary judgment.

At bottom, Defendants argument rises and falls with the proposition that any similarity between the Hubert and the Lombardi Plans is due to the fact both works are derived from 145 Hudson.  Since Plaintiff has testified that the elements of the Lombardi Plans he claims the Defendants copied are different, in material respects, from the elements of 145 Hudson, a question of fact remains regarding whether the similarities between the Lombardi Plans and the Hubert are probative of copying.  If the Lombardi Plans are dissimilar from 145 Hudson, and the Hubert is similar to the Lombardi Plans, a

---

[7] Defendants argue that Plaintiff cannot offer his own expert testimony as to the similarities between the Lombardi Plans and the Hubert because he never submitted an expert report and because he was not disclosed as an expert.  In addition to the initial disclosures mandated by Federal Rule of Civil Procedure 26(a)(1), Rule 26(a)(2)(A) states that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  Fed. R. Civ. P. 26(a)(2)(A).  In turn, Rule 26(a)(2)(B) provides: "Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."  Fed. R. Civ. P. 26(a)(2)(B).  Despite Defendants' assertion to the contrary, in order to offer his expert testimony at trial, under Rule 26(a)(2)(A) Plaintiff was only required to provide Defendants with notice of his intent to testify as an expert; Plaintiff was not required to submit an expert report pursuant to Rule 26(a)(2)(B).  As explained by our Court of Appeals, "[w]here the witness is not specially retained or employed to give expert testimony, or does not regularly give expert testimony in his or her capacity as an employee, no expert report is required."  Bank of China v. NBM LLC, 359 F.3d 171, 182 n.13 (2d Cir. 2004).  Rule 37(c)(1) states that failure to provide the information required by Rule 26(a) precludes a party from offering the non-disclosed  "information or witness" at trial.  But, failure to comply with the Rule 26(a) disclosure requirements is excusable if the "failure was substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1).  Rule 37(c)(1) also sets forth other sanctions the court may impose as an alternative to disallowing the use of the evidence at trial.  Fed. R. Civ. P. 37(c)(1)(A)-(C).   It is noteworthy that the Defendants knew that Plaintiff is an architect and that he would testify at trial.  The Court has yet to determine, however, whether Plaintiff will be allowed to testify as an expert at trial and declines to do so at this juncture.

jury could reasonably find in favor of the Plaintiff on the issue of probative similarity and hence find for the Plaintiff on the issue of actual copying.

## B. Unlawful Copying

If Plaintiff succeeds in proving actual copying, he must then show that the Defendants' copying was unlawful, to wit, "substantial similarity between the two works relating to the protectible material." Repp, 132 F.3d at 889.  The Second Circuit has not considered the question of what substantial similarity standard applies in the context of architectural works, but like other courts, trial courts in this Circuit have applied the "total concept and feel" standard.  See T. & S. Builders, 2008 WL 3211272, at *8; Winmar Homes, 2007 WL 708798, at * 13; Shine, 382 F. Supp. 2d at 612; see also Trek Leasing, Inc. v. United States, 66 Fed. Cl. 8, 18 (Fed. Cl. 2005); Sturdza v. United Arab Emirates, 281 F.3d 1278, 1296 (D.C. Cir. 2002).  In applying the "total concept and feel" standard, "[t]he factfinder must look at the work as a whole without dissection.  This entails judging the 'total concept and feel' of the structure, and a factfinder must avoid taking a divide and conquer approach in assessing elements of the work." Winmar Homes, 2007 WL 708978, at *13 (citing Tienshan, Inc. v. C.C.A. Int'l (N.J.), Inc., 895 F. Supp. 651, 658 (S.D.N.Y. 1995) and Shine, 382 F. Supp. 2d at 613).

The "total concept and feel" standard is applied through the prism of the "ordinary observer test," pursuant to which "'[t]wo works are substantially similar where "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal [of the two works] as the same."'" Castle Rock, 150 F.3d at 139 (quoting Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1072 (2d Cir. 1992) (quoting Peter Pan Fabrics v. Martin Weiner Corp., 274 F.2d 487, 489 (2d.

Cir. 1960)).  Under the ordinary observer test, a "'more refined analysis' is required where a plaintiff's work is not 'wholly original,' but rather incorporates elements from the public domain."  Boisson, 273 F.3d at 272 (quoting Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc., 945 F.2d 509, 514 (2d Cir. 1991)).  This "more discerning" ordinary observer test requires a showing of "'substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed compilation.'"  Shine, 382 F. Supp. 2d at 615 (quoting Key Publ'ns, 945 F.2d at 514).  Ultimately, however, the analysis "should be instructed by common sense."  Boisson, 273 F.3d at 273.

Defendants argue that because all of the elements of the Lombardi Plans Plaintiff contends have been copied are found in 145 Hudson, or are mandated by the Improvements Agreement, "each and every element for which Plaintiff claims similarity is not protectible," (Mem. in Supp. Mot. Summ. J. on Non-Infringement at 14), and so the Court must grant summary judgment.  This argument is wrong on the facts and misconstrues the governing law.

As explained, Plaintiff has not admitted that features of the Lombardi Plans were simply copied from 145 Hudson, and Plaintiff has testified that the elements he claims Defendants copied differ from the elements of 145 Hudson.  If Plaintiff indeed modified the elements of 145 Hudson in preparing the Lombardi Plans, those modified elements are original and protectible because they are the product of a "minimal degree of creativity."  Feist, 499 U.S. at 345.

Defendants' contention that in performing the substantial similarity analysis the Court must filter out the elements of the Hubert which were dictated by the

Improvements Agreement is not dispositive.  Even if the features claimed to be dictated

by the Improvements Agreement are excluded from the analysis, Plaintiff sets forth at

least fifteen other features of the Lombardi Plans which he claims show substantial

similarity.  Further, BKSK designed a building that was unlike the Lombardi Plans while

complying with the Improvements Agreement, though that design was rejected by the

LPC.  Thus, compliance with the Improvements Agreement does not ipso facto result in a

design similar to the Lombardi Plans.

        In addition to the questions of fact permeating the issue of substantial similarity,

the element by element approach to the substantial similarity analysis employed by the

Defendants is flawed.  Defendants attack each element of the Lombardi Plans and say

that because each element is unoriginal, and thus unprotectible, the Plaintiffs' work as a

whole is unprotectible.  But the sum of work is greater than its constituent parts, and

while the more discerning ordinary observer test excludes unprotectible elements, "[i]n

applying th[e] test, a court is not to dissect the works at issue into separate components

and compare only the copyrightable elements."  Boisson, 273 F.3d at 272 (quoting

Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1003 (2d Cir. 1995)).  "The aspect of

architectural design that is protected is the gestalt of the plans including things like an

architect's choices regarding shape, arrangement, and location of buildings, the design of

open space, the location of parking and sidewalks, and the combination of individual

design elements."  Winmar Homes, 2007 WL 708798, at * 11.  Indeed, in a similar case,

this Court explained that,

        [i]f the court followed defendants' suggestion and analyzed the elements
        of plaintiff's works separately, comparing only those elements that are
        copyrightable to those present in the designs for . . . [allegedly infringing
        work], as our Circuit noted, "we might have to decide that there can be no

30

> originality in a painting because all colors of paint have been used
> somewhere in the past."

Shine, 382 F. Supp. 2d at 610 (quoting Knitwaves, 71 F.3d at 1003). Defendants make

no attempt to compare "the *arrangement* and *coordination*" of the Lombardi Plans to the

Hubert and its Plans. Inverst Constr., Inc. v. Cantabury Estate Homes, Inc., 554 F.3d

914, 919 (11th Cir. 2008). As such, Defendants' "similarity comparison of the works at

issue" is not "accomplished at the level of protected expression." Id. By neglecting to

perform the proper analysis, Defendants have failed to show "'that there is an absence of

evidence to support [an essential element] of the nonmoving party's case.'" Repp, 132

F.3d at 890 (quoting Celotex Corp v. Catrett, 477 U.S. 317, 325 (1986)).

Defendants' final argument is that because Plaintiff has no expert to aid the jury

in applying the more discerning ordinary observer test, his infringement claims fail as a

matter of law. This argument is, however, easily dispatched because in applying the

ordinary observer test "'dissection' and expert testimony are irrelevant." Arnstein, 154

F.3d at 168; see also Altai, 982 F.2d at 713. Questions of fact remain as to whether the

elements of the Lombardi Plans differ from the elements of 145 Hudson and whether

Defendants copied the Lombardi Plans or 145 Hudson in preparing the plans for, and

constructing, the Hubert. Accordingly, the motion for summary judgment on non-

infringement is denied.

## CONCLUSION

For the foregoing reasons, Defendants motions for summary judgment on

equitable estoppel and non-infringement are DENIED. Defendants' motion for summary

judgment on Plaintiff's prayer for attorneys' fees is GRANTED. The Clerk is directed to

close the motions at docket numbers 106, 112, 118 and 131.

Dated New York, NY
March 3, 2010

So ordered
Paul A Cutty
USDS

31